UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Patricia Kratz,
      Plaintiff

v.                                    Case No. 15-cv-232-SM
                                      Opinion No. 2017 DNH 153
Richard J. Boudreau
& Associates, LLC, and
Schlee and Stillman, LLC,
      Defendants


**O R D E R**


Plaintiff, Patricia Kratz, filed this suit against her employer, Richard J. Boudreau & Associates, LLC. ("RJBA").  She seeks damages against Boudreau under Title VII and NH RSA 354-A for sexual harassment and retaliation, and asserts those identical claims against Schlee and Stillman, LLC ("Schlee & Stillman") as a "successor" to Boudreau.  (Schlee & Stillman purchased all of Boudreau's assets in April of 2015.)  Schlee & Stillman moves for summary judgment on Kratz's claims.  While it is a close call, on the record as it has been presented, the motion is necessarily denied.


**STANDARD OF REVIEW**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the

1

nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).  Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact."  Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014).  In other words, if the nonmoving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

So, to defeat a properly supported motion for summary judgment, the non-movant must support his or her factual claims with evidence that conflicts with that proffered by the moving party.  See generally Fed. R. Civ. P. 56(c).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, speculation, and unsupported conclusions.  See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).  See also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## BACKGROUND

Construing the record in the light most favorable to plaintiff, and resolving all reasonable inferences in her favor, the relevant facts appear to be as follows.

RJBA began business as a debt collection law firm in 2001. Richard Boudreau owned 99 percent of RJBA; the remaining one percent was owned by Keith Mitchell, who began working for RJBA as its head of litigation in 2006, and then worked as its Managing Attorney until RJBA's closure in April, 2015.  At its peak, the firm had ten offices in several different states,

3

including New Hampshire, Massachusetts, Rhode Island,
Connecticut, Virginia, North Carolina, South Carolina, Georgia
and Texas.  See Document No. 32-2 at 64:1-4; Document No. 32-4
at 8:4-14.

### RJBA and Schlee & Stillman

Beginning around 2013, RJBA saw its business begin to
decline.  Concerned that RJBA might not survive the decline,
Boudreau attempted to consolidate RJBA's business operations in
Woburn, Massachusetts, and decreased its workforce by
approximately 40 percent.  However, Boudreau's efforts to save
the firm were unsuccessful, and eventually RJBA was dissolved.

Before the firm dissolved, however, RJBA began negotiating
an asset purchase agreement with Schlee & Stillman.  As part of
those negotiations, Schlee & Stillman reached out to and
negotiated facilitating agreements with several of RJBA's
creditors.  Specifically, Schlee & Stillman resolved potential
issues with: (1) Cummings Properties, the owner of property that
RJBA leased for its office in Woburn, Massachusetts; (2)
Pentucket Bank, RJBA's main creditor, which had extended RJBA a
$1.3 million line of credit in return for a security interest in
RJBA's assets, including its capital, receivables and equipment;
and (3) Brooks Properties, the holders of a mortgage on property
RJBA had purchased in Salem, New Hampshire.  While the record is

4

not entirely clear, Schlee and/or Stillman also spoke with Mitchell concerning a pending litigation matter against RJBA involving Citizens Bank.  See Document No. 32-4 at 49:19 – 50:1; 14:16 – 15:9.

On April 1, 2015, an asset purchase agreement between RJBA and Schlee & Stillman was executed.  Under the agreement's terms, Schlee & Stillman paid $15,000 directly to Pentucket Bank in return for all of RJBA's assets.  The asset purchase agreement between RBJA and Schlee & Stillman included a provision that released Schlee & Stillman from "all liabilities and obligations of [RJBA] with respect to current or former employees."  Document No. 32-3 at 2.

On the same day, April 1, 2015, Schlee & Stillman opened a Woburn branch, hiring the majority of RJBA's employees.  Those employees included Boudreau, who became Schlee & Stillman's regional attorney manager, and Mitchell.  Robert O'Brien, a litigation attorney who had been working with RJBA for several years, had already begun working as an attorney for Schlee & Stillman, as of January 1, 2015.  Schlee & Stillman assumed RJBA's lease of the property in Woburn, and began operating its newly established branch out of that same office.

**Patricia Kratz & RJBA**

Patricia Kratz began working for RJBA as a debt collector on April 21, 2014, about one year before its dissolution. Shortly after starting work, Kratz says she was subjected to frequent sexual harassment by her training manager, Richard Fradette.  For example, she says Fradette would take hold of her hand and not let go; would touch her hair; rub her head, shoulders and back; and would pinch her on the side of the waist.  In addition, Fradette made comments to Kratz that were sexual in nature, including telling her that he took Viagra; that she was beautiful, and should be a model; and that he was celibate in his marriage and wanted a new wife.  Fradette also allegedly propositioned Kratz, asking her for a hug, or that she go out for drinks with him, and not tell her husband.

On May 15, 2014, Kratz complained to Greg Ormond, RJBA's Director of Operations, that she was being sexually harassed by Fradette.  Kratz then met with Ormand and a Human Resources representative concerning her complaint.  However, no remedial action was taken.

Following Kratz's complaint, she was ridiculed by other RJBA employees, including managers, for complaining about sexual harassment.  In addition, she was given poor quality leads to call.  Eventually, on June 2, 2014, Kratz was fired, purportedly

6

for not meeting her assigned quota.  Because other RJBA employees who did not meet their quota were not terminated, Kratz contends that her discharge was retaliatory - that she was actually fired because she complained about sexual harassment.

On June 12, 2014, Kratz filed a formal Charge with the New Hampshire Commission for Human Rights and the Equal Employment Opportunity Commission ("EEOC").  Notice of the Charge was sent to RJBA on June 19, 2014.  RJBA filed an answer to the Charge on August 18, 2014, which was signed and sworn to by Mitchell.

On November 12, 2014, the parties engaged in an unsuccessful mediation proceeding.  Robert O'Brien appeared at the mediation as RJBA's attorney, and Mitchell spoke with the mediator by phone.  The parties exchanged settlement proposals, but no resolution was reached.  Following the mediation, the Charge remained under investigation at the Human Rights Commission and the EEOC until after the asset purchase was completed.  On April 13, 2015, Kratz obtained a Right to Sue letter.

On June 18, 2015, Kratz filed this suit, asserting claims against RJBA under Title VII and NH RSA 354-A for sexual harassment and retaliation, and against Schlee & Stillman based on a "successor liability" theory.

**Kratz's Claim and Schlee & Stillman**

Prior to execution of the April 1, 2015, asset purchase agreement, Schlee & Stillman did not review any RJBA records concerning regulatory matters relating to RJBA, consumer complaints relating to RJBA, or any records regarding pending or potential lawsuits to which RJBA was a party.[1]  See Document No. 32-1 at ¶¶ 8-10.

Boudreau testified at deposition that he did not recall when he became aware of the Kratz matter (which Mitchell was handling on RJBA's behalf).  He was generally uninvolved, and did not remember discussing the matter with Mitchell.  See Document No. 32-2 at 53:2-16; 12:18-13:8.  Boudreau further testified that he did not notify Schlee & Stillman of the pending Kratz matter.  Id. at 50:5-10.

---

[1]   Mitchell testified at deposition that RJBA's administrative complaint records would have included Kratz's EEOC charge. Document No. 32-4 at 34:23 – 37:19.  However, Schlee & Stillman asserts that, during discovery, certain RJBA records produced did not actually include that information.  See Def.'s Reply in Supp. of Mot. for Summ. Judgment at 4.

As plaintiff correctly points out, it is unclear from the record whether those documents produced by Schlee & Stillman included the entirety of RJBA's potentially responsive documents.  See Pl.'s Surreply in Further Supp. of Opp. to Summ. Judgment at 3.  But more importantly, defendant's assertion is unsupported by any factual affidavit in the record, and is not properly before the court at this time.

For his part, Mitchell testified that he did not raise the
Kratz matter with Schlee & Stillman before April 1, 2015.  See
Document No. 32-4, at 40:12-16.  In fact, Mitchell stated that
he did not discuss the Kratz matter with anyone at Schlee &
Stillman until after Schlee & Stillman was served by Kratz in
the suit.  See id., at 43:4-6; 46:3-11.  On April 22, 2015,
while working for Schlee & Stillman, Mitchell sent a letter to
Kratz, copying the EEOC, noting that all further communication
regarding the matter should be sent directly to Boudreau, as an
individual.  Id. at 43:7-23; 48:3-6.  Mitchell did not consult
with anyone at Schlee & Stillman before sending the letter.  Id.

As previously discussed, O'Brien began working for Schlee &
Stillman on January 1, 2015.  O'Brien did not discuss the Kratz
matter with anyone from Schlee & Stillman between January 1,
2015, and April 1, 2015.  See Document No. 32-5, at 13:1-7.
And, as of the date of his deposition, August 31, 2016, O'Brien
testified that he had yet to discuss the Kratz matter with
anyone from Schlee & Stillman.  Id.

## DISCUSSION

Schlee & Stillman seeks summary judgment on grounds that it
had no notice of Kratz's claim prior to its acquisition of

RJBA's assets, and so cannot be held liable to Kratz as a successor to RJBA.

Generally, under New Hampshire law, when one corporation sells all or a substantial portion of its assets to another, the purchaser does not assume the liabilities of the seller.  See Bielegus v. EMRE of New Hampshire Corp., 149 N.H. 635, 640 (2003) ("The standard for successor liability . . . begins with the general rule of commercial law that a corporation purchasing the assets of another corporation is not liable for the seller's debts.").  Judicially recognized exceptions to that rule exist, for example, when "the asset transfer amounts to a de facto merger of the two corporations," but the rule recognizes the "free alienability of corporate assets to maximize their productive use," and "that an ordinary contract will not bind an unconsenting successor to a contracting party."  Id. at 640 (citations omitted).

Successor liability in suits involving unlawful employment practices, however, is a bit more complicated.  In such cases, federal courts have taken a more expansive view of successor liability.  See Einhorn v. M.L. Ruberton Const. Co., 632 F.3d 89, 94 (3d Cir. 2011) ("Federal courts beginning with Golden State [Bottling Co. v. NLRB, 414 U.S. 168 (1973)] have developed a federal common law successorship doctrine imposing liability

upon successors beyond the confines of the common law rule when necessary to protect important employment-related policies."); see also John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 549 (1964) ("[t]he objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.").

While our court of appeals has not directly considered the issue, other circuits addressing successor liability in the Title VII employment context have applied "a federal common law standard of successor liability . . . that is more favorable to plaintiffs than most state-law standards to which the court might otherwise look." Teed v. Thomas & Betts Power Sols., L.L.C., 711 F.3d 763, 764 (7th Cir. 2013). See, e.g., EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086 (6th Cir. 1974); Wheeler v. Snyder Buick, Inc., 794 F.2d 1228, 1236 (7th Cir. 1986); Rojas v. TK Communications, Inc., 87 F.3d 745, 750 (5th Cir. 1996). The parties here seemingly recognize, and agree, that the federal common law standard of successor liability applies. See Def.'s Mot. for Summ. Judgment at 7-8; Pl.'s Mem. in Supp. of Opp. to Summ. Judgment at 4-5.

In <u>EEOC v. MacMillan Bloedel Containers, Inc.</u>, 503 F.2d at
1094, the Sixth Circuit described a useful nine-factor test when
determining successor liability under Title VII:

> 1) whether the successor company had notice of the
> charge, 2) the ability of the predecessor to provide
> relief, 3) whether there has been a substantial
> continuity of business operations, 4) whether the new
> employer uses the same plant, 5) whether he uses the
> same or substantially the same work force, 6) whether
> he uses the same or substantially the same supervisory
> personnel, 7) whether the same jobs exist under
> substantially the same working conditions, 8) whether
> he uses the same machinery, equipment and methods of
> production and 9) whether he produces the same
> product.

The Sixth Circuit subsequently clarified that the "nine-factors
listed in <u>MacMillan</u> and subsequently adopted in regulation 29
C.F.R. § 825.107, are not in themselves the test for successor
liability.  Instead, the nine factors are simply factors courts
have considered when applying the three prong balancing
approach, considering the defendant's interests, the plaintiff's
interests, and federal policy."  <u>Cobb v. Contract Transp., Inc.</u>,
452 F.3d 543, 554 (6th Cir. 2006).

Courts have generally focused on the first three of the
<u>MacMillan</u> factors.  <u>See</u>, <u>e.g.</u>, <u>Guarcas v. Gourmet Heaven, LLC</u>,
No. CV 15-056ML, 2016 WL 7632844, at *6 (D.R.I. Nov. 30, 2016),
<u>rept. & rec. adopted</u>, No. 1:15-CV-00056-ML-PAS, 2017 WL 127868
(D.R.I. Jan. 3, 2017)) ("Turning to the elements of the federal

common law test, the cases generally deploy a three-prong approach that considers 1) whether the purchaser is a bona fide successor; 2) whether the purchaser had notice of the potential liability; and 3) the extent to which the predecessor can provide adequate relief directly."). As the Seventh Circuit noted in Wheeler, 794 F.2d at 1236, "[t]he first two factors are 'critical' because of the inequity of holding a successor liable when 'the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price.'" (quoting Musikiwamba v. ESSI, Inc., 760 F.2d 740, 750 (7th Cir. 1985)). "The remaining [seven factors] simply 'provide a foundation for analyzing the larger question of whether there is a continuity in operations and the work force of the successor and predecessor employers.'" Rojas v. TK Comm., Inc., 87 F.3d 745, 750 (5th Cir. 1996) (quoting Musikiwamba, 760 F.2d at 751) (citing Bates v. Pacific Maritime Assn., 744 F.2d 705, 709–10 (9th Cir. 1984) (three factors governing successor liability determination are (1) continuity in operations and workforce, (2) notice of the claim, and (3) ability of predecessor employer to provide relief)) (additional citations omitted).

And finally, as the Eighth Circuit observed:

> "[t]he ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." Prince [v. Kids Ark Learning Ctr., LLC, 622 F.3d 992, 995 (8th Cir. 2010)] (quoting Cobb v. Contract Transp., Inc., 452 F.3d 543, 554 (6th Cir. 2006)).  Before imposing successor liability, a court must balance the plaintiff's interests, the defendant's interests, and federal policy.  See Cobb, 452 F.3d at 554.  Imposing successor liability is appropriate only if it "strike[s] a proper balance between on the one hand preventing wrongdoers from escaping liability and on the other hand facilitating the transfer of corporate assets to their most valuable uses." EEOC v. Vucitech, 842 F.2d 936, 944–45 (7th Cir. 1988).

Nutt v. Kees, 796 F.3d 988, 991 (8th Cir. 2015).

Here, both parties focus on the critical issue of notice. "The notice requirement is animated by concerns that it is inequitable to impose successor liability upon an innocent purchaser who did not have an opportunity to protect itself by obtaining indemnification or negotiating a lower purchase price." Tsareff v. ManWeb Services, Inc., 794 F.3d 841, 849 (7th Cir. 2015).  "Where the successor has notice of a predecessor's liability, there is a presumption in favor of finding successor liability." EEOC v. N. Star Hosp., Inc., 777 F.3d 898, 902 (7th Cir. 2015).

Schlee & Stillman's position is straightforward: it cannot be held liable as a successor employer because it did not know

about Kratz's pending Title VII claim against RJBA before the
asset purchase.  Kratz counters that even if Schlee & Stillman
did not have "actual" notice of Kratz's claim, the notice
requirement is still satisfied, because Schlee & Stillman had
"constructive" notice of her claim.  In other words, Kratz
contends that "the crucial point [here] is not whether the
successor knew, but whether it should have known."  Pl.'s Br. in
Opp. to Mot. for Summ. Judgment at 9.  Had Schlee & Stillman
exercised minimal due diligence and made even the most basic of
inquiries, Kratz says, it would have readily discovered her
pending claim, and could have taken that potential liability
into account when purchasing RJBA's assets.  Instead, Kratz
notes, Schlee & Stillman conducted "selective due diligence"
into RJBA's liabilities, "utiliz[ing] selective ignorance to
discriminate between claimants."  Pl.'s Surreply in Supp. of
Opp. to Mot. for Summ. Judgment at 3.

     Kratz also points to the high degree of business continuity
present, arguing that, as a result, Schlee & Stillman had a
heightened obligation to conduct due diligence into RJBA's
liabilities.  Because Schlee & Stillman failed to adequately
conduct even minimal due diligence with respect to pending
employee claims when, as a practical matter, it was taking over

RJBA's collections business, successor liability ought to be
imposed.

Schlee & Stillman disagrees.  The applicable notice
standard, they argue, is not whether an asset purchaser "should
have known," but whether it actually did know about pending
employee claims.  Alternatively, it contends that even if
constructive notice is the standard, the evidence in this record
would not permit a reasonable jury to find that it should have
known about Kratz's pending claim.  It points out that due
inquiry was made into RJBA's liabilities that directly related
to the assets it was purchasing (e.g., the Pentucket Bank line
of credit), as well as its lease obligations.  Moreover, says
Schlee & Stillman, it had no reason to think that potential
liabilities were not being disclosed prior to execution of the
asset purchase agreement.  Nothing in the record, it says,
suggested that Kratz's claim existed.  Therefore, Schlee &
Stillman argues, Kratz has pointed to no evidence suggesting
that it "should have known" about her claim, or that it engaged
in a game of "don't ask, don't tell" with respect to her Title
VII claims.  Def.'s Reply in Supp. of Mot. for Summ. Judgment at
5.  Finally, Schlee & Stillman notes that its level of inquiry
into RJBA's liabilities was entirely appropriate, given that
this was hardly a transaction involving the purchase of

"substantial assets," but instead involved the purchase of very
modest physical assets from essentially a service company "in
financial distress and on the verge of failing."  Id. at 5-6.

     As a preliminary matter, precedent is unsettled as to
whether constructive notice is enough to establish successor
liability.  Courts addressing the issue have taken different
positions.  In 1986, the Court of Appeals for the Seventh
Circuit acknowledged – but did not resolve – the issue:

> We are not prepared to hold that absence of timely
> actual knowledge is a bar to successor liability in
> every case.  We are surely not prepared to hold it is
> never a bar.  The question is whether a judicial
> doctrine should be created, focusing perhaps on the
> diligence or lack of diligence of a successor in
> making inquiry prior to purchase, or perhaps on the
> development of indemnification rights in the successor
> as against the predecessor entity.
>
> ... However, in the present case, in which the absence
> of any timely actual knowledge on the part of the
> successor is so clear, in which substantial, while not
> complete, relief from the predecessor is available to
> the victim, and in which the ownership of the
> predecessor and of the successor is totally distinct,
> we refrain from subjecting the doctrine of successor
> liability to judicial surgery on the scale which would
> be necessary to permit [plaintiff] to obtain relief
> from [defendant successor].  More generally, the
> national dimensions of the dilemma we have described
> in this opinion are likely to be explored more
> adequately and responded to more effectively by
> Congress than by the courts.

Wheeler, 794 F.2d at 1237.

Since that time, several courts have declined to mandate purchaser due diligence in the successor liability context. See, e.g., Trustees of Chicago Plastering Inst. Pension Tr. v. Elite Plastering Co., 603 F. Supp. 2d 1143, 1151 (N.D. Ill. 2009) ("To be sure, where agents of a successor company already know of claims against the predecessor, they have a duty to inquire about the status of those claims and other claims arising from the same dispute.  But where the successor lacks such knowledge, courts should 'refrain from subjecting the doctrine of successor liability to judicial surgery' through a due diligence requirement") (citing EEOC v. Vucitech, 842 F.2d 936, 945 (7th Cir. 1988), and quoting Wheeler, 794 F.2d at 1237); see also Heavenly Hana LLC v. Hotel Union, No. 14-CV-03743-JCS, 2016 WL 524327, at *12-13 (N.D. Cal. Feb. 10, 2016) (confronting whether, in the ERISA context, "a buyer's lack of diligence can satisfy the notice requirement for successor liability," and stating that "no court — anywhere — has ever held that a subsequent employer can be held liable for a predecessor's ERISA obligations that it merely should have known about, unless the employer actually knew at least the factual basis for the liability."); United Food & Commercial Workers Local 1546 Pension Fund v. Variety Meat Co., No. 15 CV 137, 2016 WL 3213402, at *5 (N.D. Ill. June 10, 2016) ("[Plaintiff] argues that, prior to purchasing the Carpenter Street building,

[defendant] should have reviewed CG&S financial records and union obligations, and had he done so, he would have learned of the contingent liability.  But the Seventh Circuit has refused to impose a requirement for potential successor companies to conduct due diligence or inquire as to potential liabilities prior to an asset purchase in order to avoid successor liability.  Further, [plaintiff] does not identify anything that would have provided the [defendant] sufficient notice to prompt them to investigate CG&S's financial conditions or potential withdrawal liability.") (citing Wheeler, 794 F.2d at 1237).

Several other courts have taken a contrary view, and determined that constructive notice may well suffice to impose successor liability.  See, e.g., Bautista v. Beyond Thai Kitchen, Inc., No. 14 Civ. 4335 LGS, 2015 WL 5459737 at *7 (S.D.N.Y. Sept. 17, 2015) ("Several courts outside this Circuit have suggested that constructive notice is sufficient to establish notice for substantial continuity purposes . . . These decisions provide compelling policy reasons to impute constructive notice on successors who have failed to exercise due diligence.") (collecting cases); see also Goodpaster v. ECP Am. Steel, LLC, No. 1:09-CV-59 JVB, 2012 WL 5267971, at *4 (N.D. Ind. Oct. 24, 2012) ("Goodpaster I") ("For a purchaser of large chunks of assets that substantially continues the predecessor's

business line, a pending claim for a violation of a federal right is a potential liability. This allows recovery from successors who were careless, as well as those whose ignorance was strategic. Because ECP took no steps at all to discover such a claim, ECP had constructive notice of Goodpaster's suit."); EEOC v. 786 South LLC, 693 F. Supp. 2d 792, 795 (W.D. Tenn. 2010) ("constructive notice may suffice under the successor liability doctrine, at least where the relevant charges have been filed with the EEOC."); Lipscomb v. Tech. Servs. & Information, Inc., No. DKC 09-3344, 2011 WL 691605, at *8 (D. Md. Feb. 11, 2011) ("lack of timely notice of a pending EEOC investigation does not per se bar successor liability . . . With some due diligence, Defendant would have been able to ascertain that Plaintiff had filed an EEOC charge and [predecessor] was being investigated by the EEOC."); Jackson v. Lockie Corp., 108 F. Supp. 2d 1164, 1168 (D. Colo. 2000) (finding purchaser did not have notice where "there is no evidence that [purchaser] knew or with the exercise of reasonable diligence could have known prior to its purchase of assets from [predecessor] of the plaintiff's Title VII claims.").

Courts have generally recognized that the principal reason for the notice requirement (ensuring fairness by providing a

successor the opportunity to protect against potential liability

through the negotiation process) is not served if:

> prospective liabilities of this sort could be shed by
> playing ostrich.  Businesses would quickly learn they
> need only prevent actual knowledge on the part of the
> buyer.  So no seller of substantial assets would
> volunteer the existence of the claim, because doing so
> would result in a lower price.  And buyers, seeking to
> avoid the cost of valuing the prospective liability
> and the risk of underestimating it, would readily put
> blinders on.

Goodpaster v. NFLC, Inc., No. 1:09-CV-59 JVB, 2013 WL 1149568,

at *5 (N.D. Ind. Mar. 18, 2013) ("Goodpaster II); see also

Bautista, 2015 WL 5459737, at *8 ("an asset purchaser should not

avoid successor liability ... by playing an unspoken but

mutually understood game of 'don't ask, don't tell.'  Rather,

the proper rule is one that encourages shoppers for substantial

assets simply to get the whole story and adjust their offers

accordingly.") (quotations omitted).[2]

---

[2]    Several of the cases applying a constructive notice
standard seem to assume an affirmative duty on the part of the
successor to inquire into its predecessor's potential
liabilities.  The point may be more subtle, but the conclusion
is identical.  Customarily, a successor purchasing nearly the
entirety of a company's assets would be expected to exercise due
diligence with regard to its purchase.  In those instances,
however, when a successor fails to exercise even minimal due
diligence, that conduct — because it is outside the expected
norm — will raise an eyebrow.  Cf., Goodpaster II, 2013 WL
1149568, at *4 ("if [defendant] truly remained ignorant, its
myopic inquiries of [predecessor], its decision not to review
public records or contact the EEOC, and [predecessor's] sealed
lips . . . were the reasons.  So it would be a gross distortion
to say [defendant] lacked an opportunity to protect itself.").

Notably, the only court within our circuit to address the issue applied a constructive notice standard.  In Guarcas, 2016 WL 7632844, plaintiffs filed suit against their employer, Gourmet Heaven, asserting claims under the Fair Labor Standards Act.  While the suit was pending, the employer executed an asset purchase agreement, and sold the assets of the business to GSP.  Plaintiffs sought to impose successor liability upon GSP.  GSP moved to dismiss, arguing, inter alia, that plaintiffs had not sufficiently alleged that it had notice of its predecessor's potential legal obligations.  Noting the stage of the litigation, the court observed:

> At the Fed. R. Civ. P. 12(b)(6) phase, courts are forgiving of claimants who struggle to demonstrate notice before engaging in discovery.  [Thompson v.] Real Estate Mortg. Network, 748 F.3d [142,] 152–54 [(3d Cir. 2014)] (notice is not a matter as to which claimant should be expected to come forward with detailed proof at [Fed. R. Civ. P. 12(b)(6)] stage").  Rather, the inquiry focuses on whether the buyer of the business knew or should have known of the pending litigation.  [Thompson v.] Bruister & Assocs., [Inc., No. 3:07-00412,] 2013 WL 1099796, at *7 [(M.D. Tenn. Mar. 15, 2013)].  A pleading establishing that the

---

The asset purchaser's deviation from customary practice gives rise to a higher level of scrutiny, and permits an inference of constructive notice when minimal inquiry would have disclosed the potential liability.

Of course, as several cases have held, a "successor who exercises due diligence in its purchase and yet fails upon inquiry to uncover evidence of the plaintiff's lawsuit prior to the purchase will not be found to have notice."  Coleman v. Keebler, Co., 997 F. Supp. 1094, 1099 (N.D. Ind. 1998)) (citing Wheeler, 794 F.2d at 1237).

litigation is a matter of public record in a court
docket permits the inference of notice, as does the
expectation that normal due diligence, in the absence
of collusion, would uncover such matters.  Id. (citing
Musikiwamba, 760 F.2d at 752 ("Normally, the burden
[is] on the successor to find out from the predecessor
all outstanding potential and actual liabilities.")).
This approach is consistent with the compelling policy
reasons to impute constructive notice when the
pleading is sufficient to permit the inference that
the successor failed to exercise due diligence in "an
unspoken but mutually understood game of 'don't ask,
don't tell.'"  Goodpaster v. ECP Am. Steel, LLC, No.
1:09-CV-59 JVB, 2012 WL 5267971, at *4 n.3 (N.D. Ind.
Oct. 24, 2012); see Bautista, 2015 WL 5459737, at *8
("[t]he proper rule is one that encourages shoppers
for substantial assets simply to get the whole story
and adjust their offers accordingly").

Id. at *8.  The court went on to find that plaintiffs had

adequately alleged notice to GSP of its predecessor's potential

legal obligations, noting that "minimal due diligence would have

exposed that 'Gourmet Heaven' was facing FLSA liability."  Id.

The Guarcas court's analysis is persuasive.


Schlee & Stillman argues that it "had no reason to believe

all liabilities were not being disclosed prior to execution of

the agreement."  Def.'s Reply in Supp. of Mot. for Summ.

Judgment at 5.  But, the basis for its position is not entirely

clear from the record.  Schlee & Stillman does not explain how

it came to be informed of certain RJBA liabilities, including

pending litigation against RJBA, yet remained ignorant of

others.  It is clear from the record that Schlee & Stillman's

due diligence inquiries into RJBA's potential liabilities was

minimal, and with respect to potential liabilities arising from
employee claims was apparently non-existent.  Simply asking
Boudreau, or Mitchell,[3] or Schlee & Stillman's own employee,
O'Brien, about all pending matters or claims would have likely
put it on notice of the pending Kratz claim.  A cursory review
of RJBA's records (which, as Miller testified, likely would have
listed Kratz's claim as a pending regulatory matter) also would
likely have provided actual notice of Kratz's claims.  Instead,
Schlee & Stillman seemingly decided not to ask those questions,
and declined to review RJBA's records regarding consumer
complaints, regulatory matters or lawsuits to which RJBA was a
party prior to executing the asset agreement.  See Document No.
32-1, ¶¶ 8-10.

     The record evidence does not negate, and indeed may well
support an inference that Schlee and Boudreau engaged in "an
unspoken but mutually understood game of 'don't ask, don't
tell.'"  Guarcas, 2016 WL 7632844, at *8.  First, as noted, the
degree of business continuity here is quite significant: Schlee
& Stillman operates out of RJBA's former Woburn office, employs
the majority of RJBA's former employees (including its former
managers (and Boudreau)), uses the same office equipment, and

---

[3]     As previously mentioned, Schlee and/or Stillman did ask
Mitchell about the pending Citizens Bank litigation.  See
Document No. 32-4 at 49:19 – 50:1; 14:16 – 15:9.

performs debt collection services for many of RJBA's major clients.  Given the degree of business continuity, Schlee & Stillman's minimal due diligence is especially perplexing.  And, Schlee & Stillman offers no reasonable explanation for that lack of diligence.  Cf., EEOC v. 786 South LLC, No. 2:07-CV-02621-JPM, 2010 WL 4628101, at *3 (W.D. Tenn. Nov. 8, 2010) (finding issue of notice not dispositive to successor liability question where defendant "likely could have learned of the suit had it performed due diligence," but "offered reasonable explanations for the lack of due diligence.").

At least two RJBA attorneys who continued with Schlee & Stillman worked on, and were familiar with, the Kratz claim.  Indeed, O'Brien, the attorney who served as counsel of record for RJBA in the Kratz matter, began working for Schlee & Stillman several months before the asset purchase.  It seems a stretch, based on this record, to impute O'Brien's knowledge to Schlee & Stillman and conclude that it had actual knowledge of Kratz's claim, but his employment with Schlee & Stillman, while he ostensibly continued to represent RJBA in the Kratz matter before the EEOC, is a factor tending to support rather than negate an inference of constructive knowledge.

Schlee and Stillman are not unsophisticated purchasers.  Indeed, as attorneys purchasing the assets of another

collections practice, it seems reasonable to expect that it would both understand the significance of potential successor liability and the value of at least asking the seller to disclose all pending and potential employee claims, so that it might protect itself by adjusting the offered purchase price in light of any potential exposure.

Finally, while the record is largely undeveloped with respect to this point, the purchase price paid by Schlee & Stillman for RJBA's assets appears to be quite modest.  See Bautista, 2015 WL 5459737, at *8 (record supported a finding of constructive notice where, inter alia, defendants paid "suspiciously little for the assets they purchased . . . The purchase price is less than what Defendants currently pay in rent and is less than half the security deposit that they placed for the lease.").  Schlee & Stillman paid a total of $15,000 for the entirety of RJBA's assets.  Schlee & Stillman argues that the price was appropriate, because the company "was in financial distress and on the verge of failing."  Def.'s Reply in Supp. of Mot. for Summ. Judgment at 6.  However, it presents little evidence in support of its argument, and provides no information regarding a reliable valuation of the purchased assets.  The unexplained seemingly low price paid for an ongoing collections practice (while perhaps fully justifiable), standing alone, is

more suggestive of a de facto merger rather than a mere asset purchase.[4]

The court finds that, on the record as currently developed, a reasonable jury could conclude that Schlee & Stillman had constructive notice of Kratz's pending claim.[5] Accordingly, Schlee & Stillman have not shown entitlement to judgment as a matter of law with respect to successor liability.

---

[4] In Bielagus, 149 N.H. at 641, the New Hampshire Supreme Court noted that "a de facto merger" occurs when:

> a company is completely absorbed into another through a sale of assets; continues its operations by maintaining the same management, personnel, assets, location and stockholders; but leaves its creditors without a remedy for its outstanding debt. The fact-finder may look to other factors indicative of commonality or distinctiveness with the corporations. The bottom-line question is whether each entity has run its own race, or whether there has been a relay-style passing of the baton from one to the other.

(internal citations and quotations omitted). While not binding (because, as discussed extensively, federal common law is applicable here), that description is informative.

[5] As previously mentioned, "[t]he doctrine of successor liability is premised on the idea that the creditor cannot obtain satisfaction from the predecessor." Brzozowski v. Corr. Physician Servs., Inc., 360 F.3d 173, 179 (3d Cir. 2004). Whether the predecessor is able to provide relief to the plaintiff is a significant factor in determining whether successor liability ought to be imposed. Because neither Kratz nor Schlee & Stillman discuss that factor, the court assumes their agreement that the predecessor cannot provide relief.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (document no. 32) is **DENIED**.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

August 22, 2017

cc:  H. Jonathan Meyer, Esq.
     Lawrence B. Gormley, Esq.
     Daniel P. Schwarz, Esq.