UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Patricia Kratz,
        Plaintiff

        v.                                    Case No. 15-cv-232-SM
                                              Opinion No. 2019 DNH 049
Richard J. Boudreau
& Associates, LLC, and
Schlee and Stillman, LLC,
        Defendants

**O R D E R**

This case requires an examination and application of the
federal common law doctrine of successor liability.  On June 18,
2015, Patricia Kratz, filed this suit against her former
employer, Richard J. Boudreau & Associates, LLC. ("RJBA"),
seeking damages under Title VII and NH RSA 354-A for sexual
harassment and retaliation.  In October, 2015, Kratz amended her
complaint to assert identical claims against Schlee and
Stillman, LLC ("Schlee & Stillman") (now known as Stillman Law,
LLC ("Stillman Law")).  Stillman Law had purchased RJBA's assets
in April of 2015, before Kratz filed suit, but after she filed
an administrative claim with the New Hampshire Human Rights
Commission (and the Equal Employment Opportunity Commission).
The amended complaint raises a preliminary, and potentially
dispositive, issue:  Whether the federal common law doctrine of

1

successor liability renders Stillman Law liable for Kratz's antecedent employment claim.  Stillman Law asserts that it does not, and that Kratz's claim against it must be dismissed.  An evidentiary hearing was held on January 8, 2019, and the matter taken under advisement.

## BACKGROUND

RJBA was established in 2001 as a law firm concentrating in the field of debt collection.  Richard Boudreau owned 99 percent of RJBA; the remaining one percent was owned by Keith Mitchell, who began working for RJBA as head of litigation in 2006, and later worked as its Managing Attorney until RJBA's closure.  At its peak, RJBA had ten offices in several different states, including New Hampshire, Massachusetts, Rhode Island, Connecticut, Virginia, North Carolina, South Carolina, Georgia, and Texas.  See Document No. 32-2 at 64:1-4; Document No. 32-4 at 8:4-14.

In 2013, RJBA's practice began to decline.  Concerned that RJBA might not survive, Boudreau attempted to consolidate the firm's operations in Woburn, Massachusetts, and decreased its workforce significantly.  Nevertheless, the firm continued to struggle financially.

Michael Stillman and David Schlee also practiced in the debt collection field.  They served as co-managing members of Schlee & Stillman, LLC.  At the request of Discover Bank, one of Schlee & Stillman's clients (and also a client of RJBA), Stillman contacted Boudreau to arrange the transfer of responsibility for Discover's collection accounts then with RJBA.  Stillman and Boudreau were not strangers; both testified that they were friendly even before Stillman contacted Boudreau on Discover's behalf.  On January 1, 2015, Schlee & Stillman acquired Discover's active files from RJBA.  At the same time, Robert O'Brien, a litigation attorney who had been working with RJBA for several years, left and began working as an attorney for Schlee & Stillman.

Given the failing circumstances in which RJBA found itself, negotiations also ensued between Schlee, Stillman and Boudreau regarding Schlee & Stillman's purchasing RJBA's assets.  In conjunction with those negotiations, Stillman commissioned an appraisal of RJBA.  That appraisal valued RJBA's projected net orderly liquidation value at a mere $26,000, if the physical assets were sold onsite over a four-week period.

RJBA was deep in debt, many of its assets were subject to lender-held security interests, and it was on the brink of failure.  Schlee & Stillman contacted several of RJBA's

creditors and negotiated facilitating agreements, to allow a purchase of RJBA's assets free of encumbrances.  As Stillman testified, he was primarily concerned about any RJBA debts that might adversely affect the firm's clients.  Specifically, Schlee & Stillman resolved potential issues with: (1) Cummings Properties, the owner of office space RJBA leased in Woburn, Massachusetts;[1] and (2) Pentucket Bank, RJBA's principal creditor, which had extended RJBA a $1.3 million line of credit in return for a security interest in RJBA's assets, including its capital, receivables, and equipment.  Stillman testified that he also reviewed certain RJBA creditor records with Boudreau.  Finally, Stillman spoke with Mitchell concerning pending litigation matters against RJBA, particularly a case involving Citizens Bank, as well as potential claims for referral fees that might be owed on cases being handled by RJBA.

On April 1, 2015, RJBA and Schlee & Stillman executed an asset purchase agreement.  Under the agreement's terms, Schlee & Stillman paid $15,000 directly to RJBA's major creditor, Pentucket Bank, in return for all of RJBA's assets.  Stillman

---

[1]  After spending a day with a realtor searching for commercial property in Woburn for Schlee & Stillman's new office, Stillman determined (based on the costs and administrative expenses associated with moving office equipment purchased from RJBA) that it made the most financial sense to negotiate a new lease with Cummings Property for a portion of the space RJBA was about to abandon.

testified that the $15,000 purchase price was arrived at in
light of the appraisal report valuation, less an amount to
adjust for monthly rent paid by RJBA on the Woburn property (the
appraisal had estimated that an onsite sale period of
approximately one month would be required).

The asset purchase agreement was drafted by Stillman, who
testified that he is "not a sophisticated transactional
attorney," and that he likely found a form on the "LegalZoom"
website, modifying it to the best of his abilities.  The asset
purchase agreement between RJBA and Schlee & Stillman included a
provision in the form releasing Schlee & Stillman from "all
liabilities and obligations of [RJBA] with respect to current or
former employees."  Document No. 32-3 at 2.  Despite that
provision in the form, Stillman testified that he "absolutely
[did] not" have in mind any particular outstanding RJBA
employment claims that Schlee & Stillman sought to avoid.

On the same day, April 1, 2015, Schlee & Stillman opened
its Woburn branch, hiring the majority of RJBA's employees to
continue in essentially the same collections work.  Those
employees included Boudreau, who became Schlee & Stillman's
regional attorney manager, and Mitchell.  Having negotiated a
separate lease with Cummings Property that covered a smaller

5

portion of RJBA's former (now abandoned) space, Schlee & Stillman began practicing in Woburn.

The financial consideration received by RJBA from the asset purchase took the form of a small reduction in the large debt owed to Pentucket Bank.  The bank necessarily released its lien on the assets purchased, in exchange for payment being made directly to it.  RJBA then dissolved, lacking sufficient funds to even go through a formal liquidation process.[2]  RJBA was and remains judgment proof.

### Patricia Kratz & RJBA

Kratz's allegations against RJBA are fully described in the court's order on Schlee & Stillman's motion for summary judgment.  But briefly, Kratz began working for RJBA as a debt collector on April 21, 2014, about one year before its dissolution.  Shortly after starting work, Kratz says, she was subjected to frequent sexual harassment by her training manager.  On May 15, 2014, Kratz complained to Greg Ormond, RJBA's Director of Operations, and met with Ormand and a Human

---

[2]    In September, 2014, Boudreau filed for personal bankruptcy. The trustee in that case conducted a cursory review of RJBA's assets to assess Boudreau's interest, and determined that Boudreau's 99 percent ownership interest in the firm was without value.

Resources representative concerning her complaint.  She alleges
that no remedial action was taken.

Following Kratz's complaint, she says she was ridiculed by
other RJBA employees for complaining about sexual harassment,
given poor quality collection leads to call, and, eventually, on
June 2, 2014, she was fired, purportedly for not meeting her
assigned collections quota.  Kratz contends that her discharge
was in fact retaliatory - that she was actually fired because
she complained about sexual harassment.

Following her discharge, Kratz filed a formal Charge with
the New Hampshire Commission for Human Rights and the federal
Equal Employment Opportunity Commission ("EEOC"), dated June 12,
2014.  Notice of the Charge was sent to RJBA on June 19, 2014.
RJBA filed an answer to the Charge on August 18, 2014, which was
signed and sworn to by Mitchell.

On November 12, 2014, the parties engaged in an
unsuccessful mediation proceeding.  Robert O'Brien appeared at
the mediation on behalf of RJBA, and Mitchell also spoke with
the mediator by phone.  The parties exchanged settlement
proposals, but no agreement was reached.  Following the
mediation, the Charge remained under investigation at the Human
Rights Commission until after the asset purchase was completed.

On April 13, 2015, Kratz obtained a Right to Sue letter, and, on June 18, 2015, filed this suit.

### Kratz's Claim and Schlee & Stillman

Schlee & Stillman asserts that it had no knowledge of Kratz's harassment and retaliation claims when the asset purchase agreement was executed. Stillman testified that while he did review some creditor records with Boudreau prior to execution of the agreement, neither he nor Schlee & Stillman reviewed any RJBA records concerning regulatory matters relating to RJBA, consumer complaints relating to RJBA's collection activity, or any records regarding pending or potential lawsuits to which RJBA was a party.[3]

Boudreau testified that he has never met Kratz, and does not recall when he became aware of the Kratz matter (which Mitchell had been handling on RJBA's behalf). Boudreau did not remember ever discussing the matter with Mitchell, and testified that he has no recollection of any direct knowledge of Kratz's claim. Boudreau also testified that he did not tell Schlee &

---

[3] The evidentiary record suggests that any review by Schlee & Stillman may have proved fruitless with respect to discovery of Kratz's claim. Mitchell testified at deposition that RJBA's administrative complaint records would probably reflect Kratz's EEOC charge (Document No. 32-4 at 34:23 – 37:19). But, during discovery in this case, Schlee & Stillman reviewed and produced those documents. The records did not reference any claim by Kratz against RJBA.

Stillman of the Kratz claim because, he says, he did not know about it.

For his part, Mitchell testified that he did not raise the Kratz matter with Schlee & Stillman before April 1, 2015, either.  See Document No. 32-4, at 40:12-16.  Mitchell stated that he did not discuss the Kratz matter with anyone at Schlee & Stillman until well after suit had been filed and process was served on Schlee & Stillman.  See id., at 43:4-6; 46:3-11.  On April 22, 2015, Mitchell (after he had left RJBA and while working at Schlee & Stillman) sent a letter to Kratz, copying the EEOC, in which he notified her that all further communication regarding the matter should be sent directly to Boudreau, as an individual.  Id. at 43:7-23; 48:3-6.  Mitchell did not consult with anyone at Schlee & Stillman before sending that letter.  Id.

As previously noted, O'Brien began working for Schlee & Stillman on January 1, 2015.  O'Brien did not discuss the Kratz matter with anyone from Schlee & Stillman between January 1, 2015, and April 1, 2015.  See Document No. 32-5, at 13:1-7. And, as of the date of his deposition, August 31, 2016, O'Brien testified that he had yet to discuss the Kratz matter with anyone from Schlee & Stillman.  Id.

## DISCUSSION

As noted in the court's previous order, federal courts have taken an expansive view of successor liability when unlawful employment practices are involved.  See Einhorn v. M.L. Ruberton Constr. Co., 632 F.3d 89, 94 (3d Cir. 2011) ("Federal courts beginning with Golden State [Bottling Co. v. NLRB, 414 U.S. 168 (1973)] have developed a federal common law successorship doctrine imposing liability upon successors beyond the confines of the common law rule when necessary to protect important employment-related policies."); see also John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 549 (1964) ("[t]he objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.").  The parties here agree that the federal common law principle of successor liability applies.[4]

In Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1094 (6th Cir. 1974), the Sixth

---

[4] As noted in the summary judgment order in this case, our court of appeals has not directly addressed the issue of successor liability in the Title VII employment context, but there is no principled reason to think the doctrine would not apply.

Circuit described a nine-factor test useful in analyzing successor liability under Title VII:

> 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.

Courts have generally focused on the first three of the MacMillan factors, since the rest generally relate to assessing "substantial continuity," albeit in greater detail. See, e.g., Guarcas v. Gourmet Heaven, LLC, No. CV 15-056ML, 2016 WL 7632844, at *6 (D.R.I. Nov. 30, 2016), rept. & rec. adopted, No. 1:15-CV-00056-ML-PAS, 2017 WL 127868 (D.R.I. Jan. 3, 2017)) ("Turning to the elements of the federal common law test, the cases generally deploy a three-prong approach that considers 1) whether the purchaser is a bona fide successor; 2) whether the purchaser had notice of the potential liability; and 3) the extent to which the predecessor can provide adequate relief directly.").

As the Court of Appeals for the Seventh Circuit observed in Wheeler v. Snyder Buick, Inc., 794 F.2d 1228, 1236 (7th Cir.

1986), "[t]he first two factors are 'critical' because of the inequity of holding a successor liable when 'the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price.'" (quoting Musikiwamba v. ESSI, Inc., 760 F.2d 740, 750 (7th Cir. 1985)). "The remaining [factors] simply 'provide a foundation for analyzing the larger question of whether there is a continuity in operations and the work force of the successor and predecessor employers.'" Rojas v. TK Comm., Inc., 87 F.3d 745, 750 (5th Cir. 1996) (quoting Musikiwamba, 760 F.2d at 751) (citing Bates v. Pacific Maritime Assn., 744 F.2d 705, 709–10 (9th Cir. 1984) (three factors governing successor liability determination are (1) continuity in operations and workforce, (2) notice of the claim, and (3) ability of predecessor employer to provide relief)) (additional citations omitted).

Finally, as the Court of Appeals for the Eighth Circuit has observed:

> "[t]he ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." Prince [v. Kids Ark Learning Ctr., LLC, 622 F.3d 992, 995 (8th Cir. 2010)] (quoting Cobb v. Contract Transp., Inc., 452 F.3d 543, 554 (6th Cir. 2006)). Before imposing successor liability, a court must balance the plaintiff's interests, the defendant's interests, and federal policy. See Cobb, 452 F.3d at 554. Imposing successor liability is

> appropriate only if it "strike[s] a proper balance
> between on the one hand preventing wrongdoers from
> escaping liability and on the other hand facilitating
> the transfer of corporate assets to their most
> valuable uses."  EEOC v. Vucitech, 842 F.2d 936, 944–
> 45 (7th Cir. 1988).

Nutt v. Kees, 796 F.3d 988, 991 (8th Cir. 2015).

Here, that RJBA does not have the ability to provide relief to Kratz is uncontested.  The firm is dissolved and without assets.

While Schlee & Stillman does not concede the point, and it can certainly be argued the other way, the record fairly establishes the type of "substantial continuity" between RJBA's practice and Schlee & Stillman's practice (now Stillman Law) that would be consistent with imposition of successor liability. Schlee & Stillman located its Woburn practice within the same office space previously occupied by RJBA.  It practiced law, concentrating in debt collection, and engaged in debt collection activity, just as RJBA did.  Many of RJBA's clients continued on as clients of Schlee & Stillman.  It hired nearly all of RJBA's employees, to perform virtually the same work, and used the same office equipment.

As Stillman pointed out at the hearing, RJBA's clients did not become Schlee & Stillman clients as part of the asset

purchase.  Clients of a law firm are not assets, although the
"book of business" they represent may well add significantly to
the value of a firm.  Clients, of course, are free to remain
with a successor firm, or go with a different firm, or perhaps
with other attorneys leaving the firm to set up their own
practices.  Clients are free to retain whomever they choose to
represent them.  But, Schlee and Stillman did actively reach out
to RJBA's clients in an effort to enter into new relationships
with those clients, generally successfully.  So, the same work
continued to be performed for many of the same clients
previously served by RJBA, in the same place, by essentially the
same employees.  The retained clients are a factor, then, though
that factor does not by itself tip the balance much either way.
The several other factors noted are sufficient to support a
finding of substantial continuity of the prior business.

     The liability inquiry does not end there.  This particular
case turns primarily on the requirement of notice, but also on
facts unique to this case that counsel against imposing
successor liability under general equitable principles.

### **Notice (Actual & Constructive)**

     Turning to the question of notice, Schlee & Stillman
asserts that it did not have actual notice of Kratz's claim, and

14

Kratz has not presented any evidence or argument to the contrary.  Nor, says Schlee & Stillman, has Kratz established sufficient facts to allow the court to "imply knowledge from the circumstances."[5]  Tsareff v. ManWeb Servs., Inc., 794 F.3d 841, 847 (7th Cir. 2015) ("Notice can be proven not only by pointing to the facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances.").

The parties agree that there is no direct evidence of actual knowledge by Schlee & Stillman.  Accordingly, Kratz takes the position that Schlee & Stillman had constructive notice of her pending employment claim.  Because Schlee & Stillman failed to engage in due diligence, and that failure was so substantial, Kratz says, a finding of constructive notice is warranted.

---

[5]     While Kratz does not explicitly make the argument, a buyer's minimal due diligence efforts is not the type of evidence from which it may be conclusively inferred that defendants had actual knowledge of pending claims.  There are many reasons why a party might engage in minimal due diligence before purchasing assets.  A few potential explanations come quickly to mind: lack of sophistication or experience; or lack of sufficient resources to conduct a thorough investigation; or a transaction of such modest value that even a modest inquiry might be thought unnecessary.  Accordingly, minimal due diligence, alone, is generally not sufficient to establish "a strong circumstantial evidence basis from which knowledge could reasonably be inferred." N.L.R.B. v. S. Harlan Coal, Inc., 844 F.2d 380, 386 (6th Cir. 1988).

Kratz contends that, as part of a reasonable due diligence effort, Schlee & Stillman should have asked RJBA to disclose all pending claims against it.  And, Kratz specifically takes issue with Schlee & Stillman's failure to review the files of RBJA's litigation attorney, Mitchell, prior to the asset purchase, which she labels a "fundamental failure of reasonable due diligence."  Pl.'s Post-Hearing Memo. at 4.  Kratz also argues that, given the relevant industry (debt collection, in which suits by debtors against collection agencies for unfair collection practices are said to be common), and given that RJBA had laid off a significant number of its employees in the year preceding the asset purchase (increasing the risk of potential employment claims), it cannot be said that Schlee & Stillman engaged in "the type of due diligence that would be reasonable to protect the buyer given the circumstances."  Id. at 7. Schlee & Stillman's failure to affirmatively inquire about the universe of outstanding potential claims against RJBA, Kratz says, is strong evidence "that [Schlee & Stillman] either did not care or did not want to know" about her claim.  Id. at 5.

So, essentially Kratz contends that, because her claim could have been discovered through the exercise of reasonable due diligence by Schlee & Stillman, notice of her claim should be imputed to it.  In other words, because the degree of due

16

diligence Schlee & Stillman exercised was unreasonable, the court should find that Schlee & Stillman had constructive notice of her claim,[6] sufficient to impose successor liability.

The importance of notice in successor liability cases cannot be overstated.  See Musikiwamba, 760 F.2d at 750 ("The successor doctrine is derived from equitable principles, and it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when  . . .  the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price.").  See also Thompson v. Real Estate Mortg. Network, 748 F.3d 142 (3d

---

[6]    Plaintiff's position obtains some support from a recent decision by the Court of Appeals for the Ninth Circuit. In Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan, 891 F.3d 839, 845 (9th Cir. 2018), a case involving the imposition of successor liability under the Employee Retirement Income Security Act ("ERISA"), the Ninth Circuit stated: "[u]nder a constructive notice standard, purchasers are deemed to have notice of any facts that 'one using reasonable care or diligence should have.'" (quoting Black's Law Dictionary (10th ed. 2014), and citing Beneficial Standard Life Ins. Co. v. Madariaga, 851 F.2d 271, 275 (9th Cir. 1988) ("The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud.')").  But even that decision posits information in the hands of the buyer sufficient to warrant an investigation which, in turn, ought to lead to discovery of the critical fact.

Cir. 2014) (The "requirement of notice and the ability of the successor to shield itself during negotiations temper concerns that imposing successor liability might discourage corporate transactions.").

The level of due diligence conducted with respect to a particular transaction may sometimes be relevant in weighing constructive notice claims.  But, the strength of that relevance is tied, in cases like this, to whether there are facts in the record suggesting that buyers were purposefully failing to exercise diligence in order to later claim ignorance of pending employment claims, or were ignoring information that would induce a reasonable buyer to make focused inquiries.  In other words, a successor cannot be faulted for failure to conduct an inquiry if nothing put that successor on notice that inquiry was warranted.  Accordingly, a plaintiff must at least point to "red flags . . . [that] should have led the defendant to inquire further into the circumstances of the transaction."  Xue Ming Wang v. Abumi Sushi Inc., 262 F. Supp. 3d 81, 93 (S.D.N.Y. 2017).

That point is explored quite persuasively in Xue Ming Wang, supra, a successor liability case involving a Fair Labor Standards Act claim.  The plaintiff was employed as a delivery worker at a Japanese restaurant owned by 1 Chimi.  1 Chimi

(owned by Liang Zhang) sold the restaurant to Abumi Sushi, Inc.
(owned by Qing Zhong Li) in June, 2015.  Li learned that 1 Chimi
was selling the restaurant through a friend of a former
employee, and, in negotiating the purchase, dealt primarily with
the restaurant's then-manager, not Zhang.  Id. at 84.  Abumi
Sushi had no knowledge of 1 Chimi's wage and hour practices at
the time of purchase.  In December, 2015, the plaintiff filed
suit.

Abumi Sushi moved for summary judgment as to all claims
pre-dating the June, 2015, sale, and, in response, plaintiff
argued that Abumi Sushi should be held liable for violations
during the pre-sale period under the federal doctrine of
successor liability.  Id. at 85.  While Abumi Sushi had no
actual notice of the claim, or of the FLSA violations underlying
the claim, the plaintiff "urge[d] the Court to apply a standard
that would charge the Appearing Defendants with notice of the
alleged wage and hour violations if they could have been
discovered through due diligence."  Id. at 93.  In support of
that position, the plaintiff relied upon Bautista v. Beyond Thai
Kitchen, Inc., No. 14 CIV. 4335 LGS, 2015 WL 5459737, at *1
(S.D.N.Y. Sept. 17, 2015), in which the court held that
defendants had constructive notice where "certain red flags – a
suspiciously low purchase price and an uncharacteristically

quick closing – should have led the defendant to inquire further
into the circumstances of the transaction." _Wang_, 262 F. Supp.
3d at 93.

The court rejected plaintiff's position:

It is one thing to charge an innocent purchaser with
constructive notice of a lawsuit that has already been
filed against the seller, or to expect a purchaser
with actual knowledge of red flags to conduct a
further inquiry, or to expect a purchaser with actual
knowledge of wage underpayment to infer the potential
for legal liability. But Plaintiff's proposed rule is
quite another thing.  It would effectively require any
purchaser of assets to engage in comprehensive due
diligence to discover any potential factual basis for
a future claim against the predecessor, regardless of
the size of the transaction, the sophistication of the
parties, the absence of red flags, or the presence of
affirmative representations confirming the absence of
violations of law.  The Court declines to undermine
the notice requirement of the substantial continuity
test, and to impose such a duty in the absence of a
contrary command from the Second Circuit.  As the
Court has explained, Plaintiff's argument rests on a
misreading of the facts in _Bautista_.  To the extent,
however, that _Bautista_ can be read to support the
proposition that a purchaser of assets has
constructive notice of all violations of law by a
business the assets of which are sold in an asset sale
whenever those violations could have been ascertained
through the exercise of reasonable due diligence, the
Court respectfully disagrees.

Such an expansive reconstruction of the concept of
constructive notice would fatally wound the notice
requirement of the substantial continuity test,
rendering that critical requirement largely illusory.
At the very least, imposing a duty of due diligence
would risk subjecting nearly every innocent purchaser
to trial on the issue of the reasonableness of its
diligence efforts.  And, as already noted, to treat

the notice requirement as toothless, subjecting nearly
all innocent purchasers of assets to an extra-
statutory form of joint and several liability for
someone else's unlawful conduct, could beget a number
of undesirable consequences.

Wang, 262 F. Supp. 3d at 94.

Kratz does not point to any evidence of "red flags" that
should have reasonably induced Schlee & Stillman to embark upon
an investigation into the existence of potential employee claims
against RJBA.  Kratz's administrative claim was pending before
the EEOC when the asset purchase was being negotiated, but suit
had not yet been filed in a court of record.  EEOC filings are
not open for public inspection, unlike the public filings at
issue in cases where courts have found constructive notice based
on the existence of a public record.  See, e.g., EEOC v. 786
South, LLC, 693 F. Supp. 2d 792, 795 (W.D., Tenn. 2010) ("This
case was a matter of public record for two months before Tripoli
II acquired the franchise license from 786 South."); Guarcas,
2016 WL 7632944, at *8 (D.R.I. 2016) (at the motion to dismiss
stage, noting that a "pleading establishing the litigation is a
matter of public record in a court docket permits the inference
of notice.").

Similarly, there is no evidence of extensive news coverage
of RJBA's employment practices that might have alerted

defendants that some investigation into potential employee claims was warranted.  See, e.g., N.L.R.B. v. S. Harlan Coal, Inc., 844 F.2d at 386-87 ("Significant newspaper coverage only strengthens the view that Jackson knew or reasonably should have known of the unfair labor practices at Mine No. 12, and the unfair labor practices complaint filed in response thereto."). And, plaintiff's argument that RJBA's termination of several employees in its efforts to stay afloat should have alerted defendants that pending employment claims were likely, is largely undeveloped, unsupported by any relevant authority, and therefore not sufficiently persuasive.  It would of course be expected that a failing enterprise may well be cutting costs by laying off employees.

Finally, there is no persuasive evidence here suggesting that RJBA and Schlee & Stillman were somehow in collusion — turning a blind eye to potential employment claims, or engaging in a game of "don't ask, don't tell," with respect to such claims.  Defendants have plausibly explained how the modest purchase price for RJBA's assets, essentially used furniture and equipment, was calculated.  An independent appraisal conducted by BKHCO on Schlee & Stillman's behalf developed the valuation. Given the circumstances, Stillman cannot be said to have paid a suspiciously low price for RJBA's limited assets.  Cf. Bautista,

2015 WL 5459737, at *8 ("Defendants here paid suspiciously little for the assets that they purchased from Srisuk.")  Nor does the record evidence suggest an "uncharacteristically quick closing," cf., id., or any other suspect or dubious circumstance that might give rise to a finding of strategic ignorance, or collusion, or suspicious conduct, or an effort by Schlee & Stillman to obtain RJBA's modest assets but avoid liability for Kratz's claim.

Even if the court were to impose the carelessness or lack of due diligence standard urged by Kratz, the level of diligence conducted by Schlee & Stillman was, under these circumstances, reasonable, given the size and nature of the transaction.  This was not a negotiated merger, or a major transaction involving substantial valuable assets.  It was a $15,000 purchase of used goods useful in staffing a new branch office in a location where a major client of Schlee & Stillman wanted them to locate. While an opportunity to provide collection services to some clients of RJBA who opted to continue with Schlee & Stillman was of course also present, that was not the driving motivation for Schlee & Stillman's asset purchase.

Stillman testified that, prior to purchasing RJBA's assets, he was primarily concerned about RJBA liabilities that might potentially impact his firm's current or future clients.  Thus,

those were the liabilities on which he focused his attention
before the asset purchase: RJBA's $1.3 million debt to Pentucket
Bank secured by a lien on all RJBA's assets, and RJBA's
obligations under its lease in Woburn.  Accordingly, even
applying a presumptive requirement of affirmative due diligence
when purchasing assets of another business, the court cannot
conclude that Schlee & Stillman acted unreasonably with respect
to what diligence might have been due in connection with this
transaction.  Given its comparative modesty, and clear terms,
not much diligence would normally be expected.  See EEOC v. 786
South, LLC, No. 2:07-cv-02621-JMP-tmp, 2010 WL 4628101, at *3
(W.D. Tenn. Nov. 8, 2010) ("786 South II") (declining to impose
successor liability where successor likely could have learned of
the suit had it performed due diligence, but successor "offered
reasonable explanations for the lack of diligence").

**Imposition of Successor Liability Would Be Inequitable**

The federal common law doctrine of successor liability, as
applied to employment claims, is not a good fit here.  Even if
constructive notice of Kratz's employment claim were to be
imputed to Schlee & Stillman, the particular facts and
circumstances of the case would make the imposition of successor
liability inequitable.  See Heavenly Hana LLC, 891 F.3d at 847
("Even when the requirements for constructive notice are met, in

certain instances fairness could militate against imposing
successor liability.").

The notice requirement is, of course, meant to provide a
buyer with an opportunity to protect itself from potential
liability for existing employment claims.  With notice, a buyer
might negotiate a price discount to offset the potential
liability, or obtain an indemnification agreement or hold
harmless protection.  See Musikiwamba, 760 F.2d at 752.  In
Steinbach v. Hubbard, 51 F.3d 843, 846 (9th Cir. 1995), for
example, the Court of Appeals for the Ninth Circuit addressed
the notice requirement in the context of an "attempted purchase
of a company in distress."  Noting that cases involving the
transfer of assets of a failing business, as is the case here,
ought to be considered "in a different light," the court
observed:

> Because we are dealing in equity, we decline to close
> our eyes to the reality of the situation: in this
> case, because of the pending bankruptcy, there was
> little room for negotiation of protection.  In noting
> this fact, we do not intend to shield companies who
> were merely lacking in foresight.  We note only that,
> on the facts of this case, the equities underlying the
> notice prong do not weigh heavily in the employees'
> favor.

Id. at 847.

Here, RJBA was unarguably a failing business, on its last legs, facing imminent dissolution, and hopelessly in debt — all its assets subject to priority liens.  Even if Schlee & Stillman had actual knowledge of Kratz's EEOC claim, given the minimal value of RJBA at the time of the asset purchase, there was simply no room for negotiation of a lower purchase price to reflect the liability risk Kratz's claim might pose.  Schlee & Stillman's bargaining power in that regard was stymied by the lack of sufficient asset value to cover even the legal fees and costs likely necessary to defend against Kratz's claim, even assuming her claim had no merit at all.  That is, fees and costs to defend the case, alone, would quickly exceed the full purchase price, and a potentially meritorious claim would require fees and costs that would have far exceeded those costs.

Obviously, RJBA was in no position to provide a meaningful indemnity or hold harmless commitment, nor would it likely do so, even if it could, merely to facilitate a $15,000 purchase of modest assets primarily for the benefit of its major creditor (the business dissolved and Boudreau filed for bankruptcy protection).  The creditor of course had no incentive to do so as it was fully secured and the property was not worth much. So, Schlee & Stillman would have had no realistic opportunity to protect itself with respect to Kratz's claim, even if it had had

actual knowledge of it.  Schlee & Stillman would likely have had little practical choice under these circumstances but to pass on the opportunity to purchase the furniture and equipment, to no one's benefit — not RJBA's, not its creditor's, not Kratz's, and not its own — if the purchase unavoidably included Kratz's claim.

It also seems that this asset purchase, such as it was, could easily have been structured differently.  Pentucket Bank could have foreclosed on its security (the assets), taken title, and sold the assets to Schlee & Stillman, thereby avoiding any risk of potential successor liability.  That the actual transaction took a different, but functionally equivalent, form should not weigh in favor of balancing the equities against Schlee & Stillman.  The purchase, as structured, required the lienholder's agreement and required payment for the assets to be delivered to the lienholder, the lien being released contemporaneously with receipt of payment against the substantial secured debt.  The fortuity of the transaction details, while qualifying as a purchase of substantially all of the assets of the prior business, from the prior business, is a less weighty factor when the purchase could just as fortuitously have been from a creditor post-foreclosure.  Equity takes notice of the realities of such a transaction.

27

Accordingly, the equities here, on balance, do not favor imposition of successor liability.  Cf. Tsareff v. ManWeb Servs., Inc., 794 F.3d at 849 ("Shielding a successor employer from liability when the company had knowledge of the potential liability and still had bargaining power with regard to the transaction runs counter to the policies underlying the doctrine of successor liability.") (citations omitted).

## CONCLUSION

The court's earlier order on this issue identified certain gaps in the summary judgment record that raised questions as to whether Schlee & Stillman's modest due diligence was driven by an effort to evade potential liability for employment claims, including Kratz's.  Schlee & Stillman has sufficiently clarified the record, and made evident that its actual ignorance was not strategic, and its diligence efforts were reasonable and proportionate to the modest scale and type of transaction involved.  Under all the circumstances presented here, plaintiff has failed to meet her burden to establish that the imposition of successor liability would be equitable under these circumstances.  For the foregoing reasons, plaintiff's claims against Schlee & Stillman (now Stillman Law) are **DISMISSED**.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 22, 2019

cc:  H. Jonathan Meyer, Esq.
     Lawrence B. Gormley, Esq.
     Daniel P. Schwarz, Esq.
     Samuel V. Maxwell, Esq.